**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ROBIN B.,**

               **Plaintiff,**

      **v.**                         **Civil Action 2:21-cv-96**
                                       **Judge Algenon L. Marbley**
                                       **Magistrate Judge Jolson**

**COMMISIONER OF**
**SOCIAL SECURITY,**

               **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Robin B., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## I.    BACKGROUND

On November 1, 2017, Plaintiff protectively filed an application for DIB alleging disability beginning October 20, 2017. (Tr. 174–75). After this application was denied both initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on August 1, 2019. (Tr. 33–62). The ALJ denied Plaintiff's application in a written decision on October 21, 2019. (Tr. 12–32). When the Appeals Council denied review, that denial became the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on January 8, 2021 (Doc. 1), and the Commissioner filed the administrative record on June 23, 2021 (Doc. 10). The matter has been briefed and is ripe for consideration. (Docs. 15, 16).

### A.    Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's hearing and statements to the agency:

[Plaintiff] alleges disability due to the effects of multiple surgeries on her knees, limiting her ability to bend, walk, or get down on the floor. She also discussed severe arthritis in her back, limiting her ability to sit and contributing further to her difficulty walking, resulting in her constantly needing a cane. [Plaintiff] also alleged difficulty hearing, reporting a fifty percent (50%) loss of hearing in both ears, causing her to be unable to hear other than face-to-face communication. [Plaintiff] discussed how her knee impairments limit her ability to perform activities of daily living such as showering or dressing, and that she is only able to drive short distances. She testified that she is limited in her ability to shop due to difficulty walking, and she needs a cane due to her constant pain and her knee giving out on her. She also testified that frequently needs to elevate her leg and use ice or heat to help minimize her pain, also describing frequent muscle spasms and cramps in her legs as well as numbness and tingling. She discussed being unable to do chores without holding onto something, and that she cannot get on the floor when taking care of her eight-month-old daughter. [Plaintiff] also briefly discussed her mental impairments, alleging difficulty getting along and communicating with others as well as difficulty focusing on things instead of jumping around.

(Tr. 22).

### B.    Relevant Medical Evidence

The ALJ also usefully summarized Plaintiff's medical records and symptoms related to

her physical impairments during the relevant period:

The record show[s] [Plaintiff] with a significant history of left knee problems, including a total knee replacement and revision prior to the alleged onset date. (1F; 4F/2, 13, 19). Although physical therapy was noted as helping with her condition, records from October 2017, shortly after [Plaintiff] stopped working due to her knee problems, show [Plaintiff] reporting worsening symptoms including increased pain with weight bearing, although a physical examination focused on her lower left extremity was grossly normal, revealing good range of motion, normal gait, and no joint instability. (4F/56, 57, 59; 5F/88). However, subsequent evaluations noted [Plaintiff] with instability in her knee, with orthopedic surgeon Jeffrey Granger, M.D. observing flexion instability due to the previous revision stretching out her posterior cruciate ligament. (9F/11). [Plaintiff] underwent a further revision in December 2017, with subsequent x-rays noting stable post-surgical findings, and treatment notes showing her appearing to recover well, although still somewhat limited due to continued pain. (6F/159, 163; 14F/129). [Plaintiff] was placed in physical therapy, with notes showing slow improvement in range of motion, with [Plaintiff] ultimately observed as not requiring an assistive device to ambulate, able to climb stairs provided there were handrails, and increased ability to perform her

2

activities of daily living, although slight deficiencies in strength and range of motion were still observed, as well as consistent pain. (14F/7, 8, 9). Imaging continued to show no abnormalities or signs of implant problems, with observable improvement noted by Dr. Nichole Meschbach, M.D. during observations. (11F/5). [Plaintiff] was also placed on work restrictions by Dr. Granger, placing significant limitations on her ability to stand and perform postural activities, with Dr. Meschbach telling [Plaintiff] that full recovery might take as much as a year and a half. (9F; 11F/5). Subsequent observations of [Plaintiff] note continued pain and restricted motion, with [Plaintiff] noted as guarding during examination causing her range of motion to appear more decreased than further testing showed. (11F/9, 15). Records continued to show decreased strength in the left leg, with positive straight leg raises in the left leg causing neuropathic pain. (11F/9, 15). Interestingly, however, treatment notes during the period covering February 2018 through early 2019 show [Plaintiff] with no significant complaints about her knees, with [Plaintiff] generally concerned about other medical and mental health issues. (12F). [Plaintiff] also noted that although limited in her ability to perform her activities of daily living, she was capable of walking up to a mile with no limitation, despite reports of continued, profound back pain. (16F/28). Records from 2019 note [Plaintiff] continuing to show a decreased left patellar reflex, with limited range of motion, although she was observed favoring her left lower extremity when walking and with improved gait. (15F/5, 6, 10, 45). Although [Plaintiff] reported little help from injections, the most recent records in the file note her requesting a genicular block for her knee, although no treatment notes are found in the record to determine whether this has improved [Plaintiff]'s left knee impairment. (15F/7).

Regarding [Plaintiff]'s lumbar spine, imaging of [Plaintiff]'s lumbar spine in the record reveals mild degenerative changes, with December 2018 x-rays indicating facet arthrosis but no compression deformity, spondylolysis, or instability. (4F/49; 15F/68; 16F/26). [Plaintiff] has a history of reporting tingling in her lower extremities; however, an EMG from shortly before [Plaintiff]'s alleged onset date in September 2017 was normal, with no indication of large fiber neuropathy or L2-S1 radiculopathy. (2F; 6F/80, 91). A physical examination in December 2018 showed [Plaintiff] with negative straight leg raise bilaterally and normal motor, sensory, and reflex function, although it was also significant for bilateral facet loading, and other positive left sided testing. (16F/32). [Plaintiff] was also observed able to heel/toe walk and walk with a tandem gait, with her overall gait observed as normal. (16F/32, 34). [Plaintiff] underwent SI injections, reporting little relief; however, subsequent treatment notes show [Plaintiff] with intact lower extremity sensation, good strength, and generally no reflex deficits in her lower extremities, with continued negative straight leg raise as well as no tenderness and no gait disturbances or sensory or motor deficits. (15F/5, 45, 66; 16F/34). [Plaintiff] was noted as not completing physical therapy, despite recommendations to do so. (15F/5).

The record also contains imaging of [Plaintiff]'s right knee from December 2018, revealing medial compartment osteoarthritis, although the undersigned finds no

3

significant complaints or other findings related to [Plaintiff]'s right knee. (16F/21). However, the undersigned has taken this into account, and finds that along with [Plaintiff]'s continued low back pain and issues with her left knee, [Plaintiff] remains capable of sedentary work, with occasional posturals, and no climbing of ladders, ropes, or scaffolds or work at unprotected heights, and limitations on driving and exposure to vibrations.

(Tr. 23–24).

C.     The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through December 31, 2022, and has not engaged in substantial gainful employment since her alleged onset date of October 20, 2017.  (Tr. 17–18).  The ALJ determined that Plaintiff has the following severe impairments: reconstruction of the left knee, osteoarthritis of the right knee, mild degenerative disc disease of the lumbar spine, tinnitus, depression, post-traumatic stress disorder, and attention deficit hyperactivity disorder (ADHD).  (Tr. 18).  Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment.  (Tr. 18).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ concluded:

[Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally operate foot controls with her left foot, and can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never climb ladders, ropes, or scaffolds, and can never work at unprotected heights. She can occasionally work moving mechanical parts or operate a motor vehicle and can tolerate occasional vibration. She is able to perform simple, routine tasks and perform simple work-related decisions. She is able to frequently interact with coworkers and supervisors and can occasionally interact with the public. Any oral communication with [Plaintiff] should be done face-to-face.

 (Tr. 21–22).

Relevant here, the ALJ weighed the medical source opinions as to Plaintiff's physical impairments as follows:

The undersigned is also unpersuaded by the work restrictions given to [Plaintiff] in March 2018 by her orthopedic surgeon Jeffrey F. Granger, M.D., limiting her to no standing for more than one hour out of an eight-hour shift, no squatting, kneeling,

4

bending, or crawling, and no lifting greater than thirty pounds, with similar restrictions given again in April and August 2018. (9F/1; 16F/49-54). These temporary restrictions imply [Plaintiff] did suffer from limiting effects of the impairments, although a temporary restriction only covers a limited period of time and does not reflect a longitudinal assessment of [Plaintiff]'s functional abilities that would better illustrate [Plaintiff]'s residual functional capacity. However, although the limitations on postural activities are extreme given [Plaintiff]'s slow recovery, the undersigned finds it well supported by Dr. Granger's findings as well as those of Brian Valus, PA-C, and somewhat consistent with [Plaintiff]'s overall record post-surgery, with continued limitation in her left knee due to pain.

[Plaintiff] underwent an evaluation from Workwell Prevention Care conducted by Leanne Kelley in May 2019. (14F). The undersigned notes that Ms. Kelley's evaluation is based on a one-time observation of [Plaintiff] and generally would not have the reliability of a longitudinal analysis of [Plaintiff]'s medical history. Nevertheless, the undersigned is somewhat persuaded by this assessment of [Plaintiff]. Ms. Kelley opined that [Plaintiff] can frequently lift and carry up to ten pounds and occasionally up to fifteen, with further limitation in her ability to carry due to walking restrictions requiring use of a cane in her right hand. (13F/4). Ms. Kelley noted additional postural limitations as well as limitations on standing and walking due to [Plaintiff]'s left knee problems. (13F/5). The undersigned notes that her assessment of [Plaintiff] is well supported by her examination of [Plaintiff], despite as stated above being only a one-time exam, and finds that the limitations assessed are generally consistent with the record of [Plaintiff]'s continued limitations due to her back and left knee noted, such as those noted in treatment notes from early 2019. (15F/5, 6, 10, 45, 66; 16F/34).

As for the opinions of the State agency medical consultants, the undersigned finds their assessment of [Plaintiff] being capable of light work, with additional environmental limitations as well as generally frequent to unlimited posturals, except for occasional kneeling and crouching due to her left knee, unpersuasive, finding it somewhat optimistic as to [Plaintiff]'s overall recovery after her December 2017 knee surgery. (1A; 3A). Although well supported by their review of the record, and consistent with her observed progress at the time of the evaluations, the undersigned notes that they are inconsistent with the overall record, particularly taking into account later findings related to [Plaintiff]'s low back and right knee that were not available at the State agency determination level. (4F/49; 15F/5, 45, 66, 68; 16F/26, 32, 34).

(Tr. 25–26).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence." (Tr. 22).

The ALJ determined that Plaintiff was unable to perform her past relevant work as a nurse assistant. (Tr. 27). Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy, such as a circuit board assembler, cutter paster, and document preparer. (Tr. 27–28). She thus concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, at any time since October 20, 2017. (Tr. 28).

## II.      STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.     DISCUSSION

Plaintiff alleges the ALJ erred by: (1) not classifying her complex regional pain syndrome (CRPS/RSD) as a "medically determinable" impairment at step two (Doc. 15 at 9–12); (2) improperly evaluating her impairments under Listing 1.03 at step three (*id.* at 3–9); and (3) making an RFC determination that was not supported by substantial evidence at step four (*id.* at 12–14).

### A. Complex regional pain syndrome (CRPS/RSD) at Step Two

An ALJ must make several determinations at step two. First, an ALJ must consider if a claimant's impairment constitutes a "medically determinable" impairment, i.e., an impairment that results from anatomical, physiological or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1520; 404.1521. If an impairment is medically determinable, then an ALJ must determine whether it is severe. *Id.* A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

The finding of at least one severe impairment at step two is merely a "threshold inquiry," the satisfaction of which prompts a full investigation into the limitations and restrictions imposed by all the individual's impairments. *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007). "And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.'" *Id.* (quoting *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *accord Smith v. Comm'r of Soc. Sec.*, No. 2:20-cv-1511, 2021 WL 972444, at *10 (S.D. Ohio Mar. 16, 2021) (finding no error despite ALJ's failure to designate plaintiff's neuropathy as a medically determinable or severe impairment where the ALJ discussed plaintiff's neuropathy and considered its impact on plaintiff's ability to work).

Here, Plaintiff argues that because the ALJ failed to classify her complex regional pain syndrome (CRPS/RSD) impairment as either severe or non-severe, by elimination, the "default conclusion" is that it is not a medically determinable impairment. Plaintiff says that this

determination (or lack thereof) means that the ALJ gave no consideration to her CRPS/RSD and the potential impact that this impairment would have on her RFC.  (Doc. 15 at 9–10).

The severity standard at step two is a threshold inquiry and, as long as a claimant has at least one severe impairment or combination of impairments, an ALJ must proceed beyond step two and consider all impairments through the remaining steps of the evaluation process.  *See* 20 C.F.R. § 404.1523(c).  An ALJ who finds a severe impairment at step two does not reversibly err in declining to find other impairments severe.  *See Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  Here, the ALJ found several severe impairments at step two and proceeded through the sequential analysis.  (Tr. 18).

Plaintiff argues that the failure to classify an impairment as medically determinable should be subject to a different standard of review than the failure to classify an error as severe.  (Doc. 15 at 11) ("These errors are different than the ALJ merely mischaracterizing a severe impairment, as a non-severe impairment, because, in such a situation, the non-severe impairment would still receive consideration throughout the evaluation process.").  True, when "an alleged impairment is not medically determinable, an ALJ need not consider that impairment in assessing the RFC." *Jones v. Comm'r of Soc. Sec.*, No. 3:15-cv-00428, 2017 WL 540923, at *6 (S.D. Ohio Feb. 10, 2017).  But when the ALJ does consider the evidence supporting the impairment when crafting the RFC, as the ALJ did here, the harmless-error analysis should be the same.  In other words, Plaintiff's argument "raises a distinction without a difference . . . ." *Fresquez v. Comm'r of Soc. Sec.*, No. 1:18cv114, 2019 WL 1440344 at *1 (S.D. Ohio Mar. 31, 2019) (declining to apply a different

harmless-error analysis when the ALJ did not list plaintiff's chronic fatigue syndrome as a medically determinable impairment at step two yet considered it nonetheless in the RFC).

Up front, the Undersigned notes that Plaintiff overstates her claim when saying that the record "consistently documents" her complex regional pain syndrome. (Doc. 15 at 10). The two records she cites (Tr. 1119, 1184) instead say that she might have such a diagnosis. More importantly, the ALJ determined Plaintiff had other severe impairments and continued with an analysis of all the relevant evidence to determine Plaintiff's residual functional capacity (RFC), the most she could do in the workplace on a sustained basis. 20 C.F.R. § 404.1545. At the subsequent steps in the evaluation process, the ALJ considered not just Plaintiff's impairments, but also the work-related limitations established by those impairments. Under the law, it does not matter whether any limitation was the result of one impairment or another. What matters is that the ALJ evaluated the relevant records and considered what the evidence showed relating to any work-related limitations, regardless of origin or cause.

The ALJ's decision shows that she took into account the records that Plaintiff now says demonstrate her CRPS/RSD. For example, the ALJ considered Plaintiff's continued pain and "slight deficiencies in strength and range of motion" despite good recovery with no signs of implant problems after her December 2017 left knee replacement surgery. (Tr. 23, citing 891–93, 935–38, 940–43, 946–52, 1013–16). The ALJ noted that Plaintiff stopped using an assistive device just a couple months after her December 2017 surgery (Tr. 23, citing 1013–16). The ALJ did not quote Dr. Meschbach's September and December of 2018 notes suggesting that Plaintiff should be evaluated for "possible RSD," but she discussed Dr. Meschbach's physical exam findings from those appointments. Specifically, she considered Plaintiff's "decreased strength in the left leg, with positive straight leg raises in the left leg causing neuropathic pain" (Tr. 23, citing 940–43, 946–52),

and noted that despite such findings, Plaintiff also reported that she was working out regularly and could walk up to a mile with no limitation around the same time. (Tr. 23, citing 966–67, 1169–76). In addition, the ALJ considered evidence added to the record after the reconsideration level. Specifically, she acknowledged findings such as "decreased left patellar reflex, with limited range of motion," "bilateral facet loading, and other positive left-sided testing," "favoring her left lower extremity when walking," and "tandem gait" at appointments where possible CRPS/RSD diagnoses were mentioned (Tr. 24, 26, citing 1059–66, 1096–99, 1112–20, 1169–76), in finding Plaintiff more limited than proposed by the state agency reviewing doctors. (Tr. 21–22, 26, 63–76, 78–91). The ALJ referred to Plaintiff's reported pain throughout the decision. (*See, e.g.*, Tr. 21, 22, 23).

In sum, Plaintiff has not shown how CRPS/RSD imposed greater limitations than those found by the ALJ in her RFC determination. So no reversible error has been shown at step two.

**B. Listing 1.03 At Step Three**

Plaintiff next challenges how the ALJ considered listing 1.03. The listing involves reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, and return to effective ambulation did not occur, or is not expected to occur, within twelve months of onset. *See,* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.03.

When discussing listing 1.03 at Step 3, the ALJ explained:

> [Plaintiff]'s attorney argued that [Plaintiff] meets the listing for 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint) due to her history of knee surgery and difficulties with ambulation. (hearing testimony). To meet the listing at 1.03, the record must demonstrate [Plaintiff] has an inability to ambulate effectively, without a return to effective ambulation within twelve months of the onset. As discussed above, [Plaintiff] is capable of ambulating effectively, requiring only a single point cane to ambulate. Although records note [Plaintiff] using a walker shortly after her knee replacement, treatment notes show her able to wean off of walker use roughly eight months after her April 2017 revision surgery, and one month after her December 2017 revision, and she was observed using no device shortly thereafter, in February 2018. (14F/8, 22). Accordingly, the undersigned finds that the requirements for listing 1.03 are not met.

10

(Tr. 19).

So, at step three, the ALJ concluded that Plaintiff did not meet or medically equal any listing. The purpose of step three is to identify claimants whose impairments are so severe that they would "prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); 20 C.F.R. § 404.1525. Because an affirmative finding at step three means that the claimant is per se disabled, the criteria are substantial and higher than the standard for disability under the Social Security Act. *Id.* Clearing this high hurdle has a benefit: A listing level impairment precludes all work, not just work above the substantial gainful activity level, as required under the Social Security Act's definition of disability. *Id.*

Listing 1.03 describes reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, and return to effective ambulation did not occur, or is not expected to occur, within twelve months of onset. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.03. While the record shows that Plaintiff had replacement surgery of a major weight-bearing joint, there is no evidence in the record suggesting that return to effective ambulation did not occur within twelve months of onset. The evidence instead shows that Plaintiff did not meet the requirements of Listing 1.03.

The ALJ's conclusions at step three are also supported by the only medical sources in the record that considered whether Plaintiff met or medically equaled a listing. Doctors Hughes and McKee considered the listings and determined that Plaintiff did not meet or medically equal any listing and, instead, could perform a range of work. (Tr. 63–76, 78–91). They expressly considered listing 1.03 and found that Plaintiff did not meet the requirements of the listing. (*Id.*). These findings constitute substantial evidence to support the ALJ's step three findings. *See Brauninger*

*v. Comm'r of Soc. Sec.*, No. 18-3495, 2019 WL 2246791, at *7 (6th Cir. 2019) (holding that a medical expert's opinion, in combination with other objective medical evidence, constituted substantial evidence to support an ALJ's step three determination).

Though Plaintiff criticizes the ALJ's decision for failing to include more analysis at step three, this was not error. *See Price v. Heckler*, 767 F.2d 281, 284 (6th Cir. 1985) (noting that minimal articulation is required at step three). The ALJ discussed multiple listings at step three, including listing 1.03, and gave reasons for finding that Plaintiff did not meet or medically equal any musculoskeletal listing. (Tr. 18–19). In addition, the remainder of the ALJ's decision contained analysis and a lengthy discussion of Plaintiff's physical capabilities, including her ability to walk. (Tr. 18–26). *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365-366 (6th Cir. 2014) (finding no error where the ALJ did not mention Listing 1.02 because sufficient factual findings elsewhere in his decision supported his step three conclusion). Thus, any brevity of the ALJ's analysis at step three was not error.

While Plaintiff has cited to a fair amount of evidence, she has not explained how the evidence meets the listing requirements. In fact, much of Plaintiff's citied evidence pre-dates the relevant period. (*See* Doc. 15 at 8 (citing 284, 289, 298–99, 463–64)). Further, while Plaintiff cites evidence showing some positive physical exam findings from the relevant period, this evidence does not show that return to effective ambulation did not occur within twelve months of onset. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.03. Indeed, the record supports the ALJ's finding that Plaintiff was "capable of ambulating effectively" during the relevant period. (Tr. 19). To come to this conclusion, the ALJ relied upon (and cited) the following evidence: Plaintiff stopped using a walker one month after her December 2017 surgery and ambulated without any assistive device by February 2018 (Tr. 19, citing 1013–16, 1027–28); Plaintiff could walk a mile without any limitation

and was working out regularly in December 2018, despite also reporting low back pain and "profound" left knee pain (Tr. 23, citing 966–67, 1169–76); and Plaintiff demonstrated a normal gait on physical exams in December 2018 and March 2019.  (Tr. 24 (citing 1112–20, 1169–76)).

Moreover, as the ALJ noted, while Plaintiff reported problems by May 2019 and presented for testing at a functional capacity evaluation with a straight cane, she was "only using a cane in her right hand for ambulation and [] not requiring a device that restricts the use of both upper extremities such as two canes or a walker." (Tr. 18–19, 24, citing 982, 1056–58, 1059–66). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b2 (including the inability to walk without the use of a walker, or two crutches or two canes as examples of ineffective ambulation).  Accordingly, substantial evidence supports the ALJ's conclusion at step three.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.912(a), 404.920(a)(4)(i)-(iv) (noting that claimant bears the burden of production at steps one through four); *see also Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden at step three).

### C.  Residual Functional Capacity

Plaintiff also challenges the RFC.  An RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). An RFC is an "administrative finding," and the final responsibility for determining an individual's RFC is reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at * 1–2 (July 2, 1996).  The Sixth Circuit has explained that "the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).  Here, Plaintiff says that the ALJ should have included the use of a cane in the RFC.  (Doc. 15 at 13–14).

Upon review, the Undersigned finds no error.  First, the ALJ accurately detailed Plaintiff's relevant treatment history, acknowledging her "significant history of left knee problems" as well as her surgery in December 2017.  Yet, as the ALJ noted, shortly after the alleged onset date, records show that Plaintiff was "capable of ambulating effectively" during the relevant period.  (Tr. 19–28).  The ALJ explained her conclusion by noting that Plaintiff stopped using a walker one month after her December 2017 surgery and ambulated without any assistive device by February 2018 (Tr. 19, citing 1013–16, 1027–28); Plaintiff could walk a mile without any limitation and was working out regularly in December 2018, despite also reporting low back pain and "profound" knee pain (Tr. 23, citing 966–67, 1169–76); and Plaintiff demonstrated a normal gait on physical exams in December 2018 and March 2019 (Tr. 24, citing 1112–20, 1169–76).  Moreover, as the ALJ wrote, while Plaintiff reported more problems by May 2019, and presented for testing at a functional capacity evaluation with a straight cane, she was "only using a cane in her right hand for ambulation and [] not requiring a device that restricts the use of both upper extremities such as two canes or a walker" (Tr. 18–19, 24, citing 982, 1056–58, 1059–66). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b2 (including the inability to walk without the use of a walker, or two crutches or two canes as examples of ineffective ambulation).  Based upon this record, substantial evidence supports the ALJ's decision not to include the use of an assistive device in the RFC.

Additionally, even if the ALJ should have required the use of an assistive device in the RFC, Plaintiff has not shown that the error was harmful.  The social security rulings address this issue: "Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to

perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand."  Social Security Ruling 96–9p, 1996 WL 374185, at *7 (July 2, 1996).

And the vocational expert's testimony supports this conclusion.  The ALJ presented the VE with a hypothetical question that included Plaintiff's vocational characteristics and RFC.  (Tr. 59). The vocational expert testified that Plaintiff could perform the requirements of representative occupations such as circuit board assembler (Dictionary of Occupational Titles – DOT 726.684-110), cutter paster (DOT 249.587-014), and document preparer (DOT 249.587-018).  (*Id.*).  The ALJ then asked the vocational expert whether "cane use for ambulating and standing" would affect the jobs listed  (*Id.*).  The vocational expert responded that "those jobs would still exist" with use of a cane.  (*Id.*).  Because no harmful error has been shown, remand is not required.  *See Kavanaugh v. Comm'r of Soc. Sec.*, No. 2:15-CV-28462016 WL 4721210, *11 (S.D. Ohio Sept. 9, 2016) (affirming the ALJ's decision because "the limitation at issue, occasionally performing these tasks, was not an excluding limitation for either of these occupations.  Had the ALJ correctly included this limitation in the hypothetical he posed to the VE, the VE's answer regarding these two occupations would have remained the same.").

## IV.    CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of

those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   February 23, 2022                    /s/ Kimberly A. Jolson
                                             KIMBERLY A. JOLSON
                                             UNITED STATES MAGISTRATE JUDGE